IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

USDC - GREENBELT
'26 JUN 22 PM3:48

DELALI NORVOR aka DELANEY NORVOR,
Plaintiff,
v.
NATIONAL APARTMENT ASSOCIATION;
ANNE TOMKINSON,
AYIESHA BEVERLY,
Defendants.
Civil Action No. 8:25-cv-03436-DKC

## AMENDED COMPLAINT

Plaintiff, Delali Norvor aka Delaney Norvor, files this Amended Complaint against the above-named Defendants for violations of federal and state laws governing employment discrimination, retaliation, wrongful termination, intellectual property theft, and Maryland state torts, and in support thereof states as follows:

### I. JURISDICTION AND VENUE

1. This action arises under the Americans with Disabilities Act (ADA), Title VII of the Civil Rights Act of 1964, and corresponding provisions of Maryland law.

2. Venue is proper in the United States District Court for the District of Maryland, as the events giving rise to this Complaint occurred within the jurisdiction of this Court.

### II. PARTIES

1. Plaintiff Delali Norvor aka Delaney Norvor is a Black physically disabled woman and former Director of Product Management at the National Apartment Association ("NAA").

2. Defendant NAA is a non-profit trade organization headquartered in Arlington, Virginia, conducting operations that reach Maryland.

3. Defendant Anne Tomkinson was, at all relevant times, the Senior Vice President of Human Resources.

4. Defendant Ayiesha Beverly served as General Counsel and oversaw NAA's legal and compliance functions.

### III. FACTUAL BACKGROUND

1. Plaintiff began employment with NAA in 2024 as its first traditional Director of Product Management.

2. Plaintiff implemented reforms that improved productivity, retention, and cross-functional collaboration across IT, Legal, Product Operations, Finance, and Business Excellence.

3. Plaintiff's performance and leadership were praised internally and externally, and she was on track for promotion to Vice President of Product Management.

4. As part of her leadership achievements, Plaintiff promoted multiple team members—including Hannah Lloyd, Amelia Colvig, and Gina Torretti—and secured pay raises for Lloyd, Colvig, Nicola Tetu, and Torretti. She advocated for equitable hiring practices, successfully hiring Danial Danish when Tomkinson and Skinner had pushed for a cheaper property-manager candidate even though the role was technology-focused. She also helped Hannah Lloyd expand her team by hiring Mballu Han and Ashley Pinckney, strengthening department capacity and collaboration.

5. In Fall 2024, Plaintiff was nominated for two NAA All Staff Awards:
   - Recognized for leading the Product Team to rank among the top four highest-performing teams organization-wide.
   - Best Employee Nominee – Growth and Empowerment, acknowledging her success in upskilling staff and fostering measurable growth.

6. In December 2024, shortly before the emergency incident that later became the pretext for termination, Plaintiff received direct emails from both the CEO and COO praising her after she submitted a comprehensive year-end recap email celebrating her team's achievements to boost morale among employees who had been demoralized before her arrival. These records demonstrate Plaintiff's strong standing, leadership, and high performance immediately prior to retaliation.

7. Despite this record, Defendants engaged in a pattern of discriminatory and retaliatory treatment following Plaintiff's accommodation requests and advocacy for inclusion.

8. Under Tomkinson's direction, NAA terminated multiple Black women—including Plaintiff, Susan Wasem, and Dominique Mackey—within the same twelve-month period; LaKeesha Wilson was also terminated. Susan Wasem, who served as NAA's Director of Human Resources, and Dominique Mackey, an HR Recruiter she hired before her own termination, both reported directly to Tomkinson. Before Dominique Mackey's first day, Susan Wasem was fired. At the time, Susan Wasem was completing her master's degree in Human Resources at Georgetown University and had recently earned her SHRM-CP certification, demonstrating strong professional credentials and active pursuit of HR excellence.

9. In contrast, Defendant Anne Tomkinson's own SHRM-CP certification had expired, yet she was promoted to Senior Vice President of Human Resources in early 2025—just weeks before Plaintiff's termination. Within her first week as SVP, Tomkinson executed Plaintiff's termination, making it one of her earliest executive actions in the role.

10. Replacements: Plaintiff has since been replaced by a white woman, Lesley Anderson, who is believed to earn approximately $40,000 more than Plaintiff for similar duties;

Susan Wasem was replaced by Karen Iacobelli (white); and LaKeesha Wilson was replaced by Erin Burnett (white). These personnel shifts illustrate a pattern of replacing Black women in leadership with white successors at higher pay levels under Tomkinson's supervision.

11. Plaintiff was terminated without any pre-termination fact-finding, interview, or due process after a fully repaid corporate-card transaction was weaponized as pretext.
12. Defendants further denied unemployment benefits and withheld Plaintiff's earned bonus, compounding harm.

13. In February 2025, Plaintiff served her first set of demand letters proposing reinstatement as Vice President of Product Management. NAA rejected the proposal.

14. In July 2025, Defendants copied Plaintiff's former job description and posted it on Indeed, LinkedIn, and NAA's website under the same duties and title she had proposed.

15. In August 2025, after referral by the Virginia Office for Civil Rights under the Virginia Attorney General, Plaintiff received an EEOC Right-to-Sue letter, and counsel sent a renewed formal demand.

16. The EEOC accepted the case without a live intake interview—an unusual bypass indicating strong supporting documentation.

17. After counsel's August letter, NAA removed the copied posting. The role remained vacant for months after Plaintiff's termination.

18. In September 2025, NAA publicly hired Lesley Anderson, a white woman, to fill Plaintiff's former position. On information and belief, this hiring occurred shortly after Defendants were informed by Plaintiff's counsel of her pending federal job offers—one a C-suite position with a startup in partnership and funded by the U.S. Department of Commerce's International Trade Administration, and another GS-15 Director role awaiting project match in the U.S. Digital Service (White House Executive Office of the President).

19. Defendants' outside counsel, John Micheal Remy and Mary Mullen of Jackson Lewis P.C., engaged in bad-faith tactics intended to wear down the disabled Plaintiff by ignoring multiple deadlines, delaying replies, and failing to comply with agreed timelines despite repeated follow-ups by Plaintiff's prior counsel.

20. These actions were calculated to discourage, financially strain, and exhaust Plaintiff after being denied unemployment.

21. Multiple Black women at NAA reported that Tomkinson verbally insulted and demeaned them. One long-tenured employee stated she had no problems until Tomkinson's hire, indicating a hostile shift under her leadership. Upon information and belief, Tomkinson

texted former employee Dominique Mackey, who has ADHD, instructing her to delete evidence confirming that her 90-day performance review had been altered after termination. This constitutes deliberate evidence tampering and retaliation.

22. When Plaintiff contacted Hayley Esteves, Director of Accounting, to ask whether other employees had used corporate cards for personal expenses and repaid them, Hayley Esteves blocked Plaintiff. When Plaintiff sought references from former direct and indirect reports, none responded, consistent with direction from Tomkinson or Beverly to avoid contact.

23. Plaintiff has a transcript in which Skinner described the corporate card policy as "draconian." VP of Finance Adriana Manea stated that employees could request advances through Finance, but HR Director Karen Iacobelli said she confirmed with Tomkinson that no advances were offered. Adriana Manea—unaware that Plaintiff had already informed her supervisor, Ron Skinner and Darya Kishkurna and submitted the expense report for payroll deduction—cc'd Tomkinson, who immediately scheduled a 15-minute termination call instead of a meeting or investigation.

24. Despite financial hardship, Plaintiff remained private and professional, declining to publicize the dispute or accept press offers that could have damaged NAA's image. She was offered a major feature by a leading tech publication in February 2025 but declined.

25. In April 2025, Plaintiff was a scheduled Bloomberg keynote speaker on disability-inclusive leadership. Through counsel, she sought written permission from Defendants' outside counsel to reference her NAA work. They never responded, forcing last-minute edits. Her text-to-speech visuals were delayed, resulting in Bloomberg rescheduling her from the opening keynote to the closing slot—a tangible, reputation-harming consequence of Defendants' obstruction.

**COUNT I – Disability Discrimination (ADA)**

1. Plaintiff incorporates all preceding paragraphs.

2. Plaintiff has dystonic cerebral palsy, selective mutism, fibromyalgia, and mild hearing loss, conditions that substantially limit major life activities and require reasonable accommodation.

3. Defendants knew of Plaintiff's disabilities but failed to engage in the interactive process or provide support, and instead targeted Plaintiff for removal.

**COUNT II – Retaliation (ADA and Title VII)**

1. Plaintiff incorporates all preceding paragraphs.

2. Plaintiff engaged in protected activity by requesting accommodations and advocating for accessibility and equal treatment.

3. Defendants retaliated by heightening scrutiny, excluding Plaintiff from decisions, constructing a false narrative, and terminating her employment.

**COUNT III – Retaliatory and Discriminatory Discharge (Pretextual Termination)**

1. Plaintiff incorporates all preceding paragraphs.

2. Plaintiff accidentally used her corporate AmEx instead of her personal AmEx (she has multiple personal Amex cards) to make an emergency purchase while helping her former partner's toddler siblings avoid foster care after abandonment by their drug-addicted mother.

3. Plaintiff promptly submitted the expense report and approved payroll deduction, leaving her with approximately $1,000 net pay that period.

4. Plaintiff never disputed repayment.

5. Shortly after, Tomkinson scheduled a 15-minute termination call rather than an investigation. During the call, Tomkinson stated that NAA "could have pressed charges," and Skinner smiled and nodded, affirming the retaliatory tone.

6. After termination, Beverly sent a separation agreement offering to forgive a $500 remainder if Plaintiff signed a release of claims. Plaintiff declined, requested an invoice, and paid it in full—leaving her with only $500 remaining from that paycheck.

**COUNT IV – Intentional Infliction of Emotional Distress (IIED)**

1. Plaintiff incorporates all preceding paragraphs.

2. Defendants terminated Plaintiff without cause, in violation of due process and public policy.

3. Their conduct caused extreme emotional distress and a mental health crisis requiring emergency intervention.

**COUNT V – Systemic Discrimination and Hostile Work Environment**

1. Plaintiff incorporates all preceding paragraphs.

2. Defendants maintained a racially hostile environment, disproportionately targeting Black women in leadership while shielding similarly situated white employees from discipline.

3. This included replacements at higher pay, documented verbal abuse, and evidence tampering by Tomkinson.

**COUNT VI – Misappropriation of Trade Secrets / Proprietary Business Concepts and Retaliation**

1. Plaintiff incorporates all preceding paragraphs.

2. During her tenure, Plaintiff developed proprietary organizational structures, strategies, and job responsibilities that were directly tied to her unique expertise and the proposals she created.

3. During pre-litigation discussions, Plaintiff proposed her own reinstatement and a promotion to an original role she explicitly designed: "Vice President of Product." This role had never existed at the organization prior to Plaintiff conceptualizing and presenting it.

4. Defendants rejected Plaintiff's reinstatement and promotion proposal.

5. In July 2025, Defendants copied Plaintiff's exact reinstatement proposal duties and former job description, publicly posting the newly created role online on Indeed, LinkedIn, and the NAA website.

6. Defendants subsequently hired a white woman for this precise role, providing her with the exact salary range that Plaintiff had advised and requested during her negotiations.

7. The assigned EEOC investigator observed this sequence of events in real-time and explicitly advised that Defendants' actions in copying the role and hiring a replacement under these terms constituted direct retaliation.

8. Defendants misappropriated this intellectual property for their own commercial and organizational benefit without Plaintiff's permission, attribution, or compensation, intentionally utilizing her proprietary work to recruit her replacement in a retaliatory manner.

**COUNT VII – Maryland State Tort Claims (Intentional Interference, Harassment, and Evidence Tampering) Against Individual Defendants Tomkinson and Beverly**

1. Plaintiff incorporates all preceding paragraphs.

2. As recognized under Maryland state law, individual defendants may be held liable for distinct tortious acts committed within or adjacent to the scope of their employment.

3. Defendants Anne Tomkinson and Ayiesha Beverly intentionally and maliciously interfered with Plaintiff's employment relationship, prospective economic advantage, and post-termination opportunities.

4. Defendant Tomkinson engaged in active evidence tampering by instructing a former employee to delete evidence regarding altered performance reviews via SMS texting, a

tortious act designed to subvert Plaintiff's and others' claims.

5. Defendant Beverly participated in discriminatory conduct, harassment, and the bad-faith withholding of separation benefits and unemployment disputes to financially exhaust and punish Plaintiff.

6. The actions of Tomkinson and Beverly were willful, malicious, and outside the bounds of lawful, good-faith corporate administration, thereby establishing individual tort liability.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

a. Award compensatory damages of $900,000 or more;
b. Award punitive damages to deter future misconduct;
c. Award back pay, lost bonuses, and benefits;
d. Award damages for the unauthorized use and misappropriation of intellectual property;
e. Hold Defendants Tomkinson and Beverly individually liable for Maryland state torts;
f. Award attorney's fees and costs;
g. Grant such other relief as the Court deems just and proper.

Respectfully submitted,

Delali Norvor, aka Delaney Norvor
Plaintiff, *Pro Se*
Dated: June 18, 2026
10516 John Glenn St
Lanham, MD 20706
Contact: delalinorvor@icloud.com